UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

TURHAN E. W.,                          )
                                       )
        Plaintiff,                     )
                                       )
    vs.                                )        Case No. 1:18 CV 45 (JMB)
                                       )
NANCY A. BERRYHILL,                    )
Deputy Commissioner of Operations,     )
Social Security Administration,        )
                                       )
        Defendant.                     )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On September 3, 2015, plaintiff Turhan E. W. protectively filed applications for a period

of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and

supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date

of April 15, 2013, which was later amended to September 1, 2015.  (Tr. 299-300, 301-06, 225-

26, 344).  After plaintiff's applications were denied on initial consideration (Tr. 209-16; 217-24),

he requested a hearing from an Administrative Law Judge (ALJ).[1]  (Tr. 238-39).

Plaintiff and counsel appeared for a hearing on November 7, 2017.  (Tr. 69-104).

Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.

---

[1] Plaintiff previously filed applications under Titles II and XVI, alleging disability beginning on January
1, 2006.  An ALJ denied those applications in a decision issued on October 15, 2014.  (Tr. 197-205).

The ALJ also received testimony from vocational expert Delores E. Gonzalez, M.Ed.  The ALJ issued a decision denying plaintiff's applications on November 20, 2017.  (Tr. 11-25).  The Appeals Council denied plaintiff's request for review on January 12, 2018.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.     Disability and Function Reports and Hearing Testimony

Plaintiff, who was born on February 26, 1977, was 39 years old on the amended alleged onset date.  He had been married and divorced twice and had two children who lived with their mothers.  (Tr. 761).  He served in the Air Force between 1998 and 2000, with non-combat deployments in Texas, Iraq, Iran, and Kuwait.  (Tr. 330, 170, 763).  He received a medical discharge in 2006.  (Tr. 763).  He completed an associate's degree in 2002 or 2003 and made significant progress toward a bachelor's degree.  He stopped taking courses in January 2007 due to severe headaches.  (Tr. 141-42).  He held a number of jobs in addition to his military service, including as a catalog model, a cook, a data entry clerk, assistant retail manager, cashier, parking booth attendant, police dispatcher, office cleaner, warehouse laborer, pawn-shop associate, machine operator at a cotton gin, fork-lift operator for a roofing company, and stand-up comedian.  (Tr. 143-53, 175-80).  He last worked between September 2013 and January 2014, delivering newspapers, but the action of rolling and throwing newspapers caused wrist pain.[2] (Tr. 143).

When plaintiff applied for disability benefits in 2015, he listed his impairments as right wrist injury, radial nerve damage, severe head trauma, migraines, asthma, PTSD, anxiety, and

---

[2] According to the transcript, plaintiff testified that he rolled and threw 1,200 papers in a two-hour period. (Tr. 143).  Elsewhere, plaintiff reported that the number of papers was 300.  (Tr. 761).

"mental." (Tr. 356). He listed his medications as amitriptyline to treat depression, gabapentin to treat nerve pain, and vitamin D3. (Tr. 359). Plaintiff testified at the November 2017 hearing that he was prescribed promethazine for nausea, the muscle relaxer tizanidine, nortriptyline for nightmares, cyclobenzaprine for back spasms, sumatriptan for migraines, and Viagra. Some of the medications caused drowsiness and blurred vision. (Tr. 166-67).

In a Function Report completed in September 2015 (Tr. 368-78), plaintiff described his daily activities as reading scripture, walking "lightly" around his property to get some exercise, taking care of a pet, and watching television. He went to bed at 8:00 p.m. due to his medications, but his sleep was interrupted by wrist pain and headaches. He was unable to maneuver clippers to shave. He needed constant reminders to take his medications. He cooked every day if he had an appetite, spending one to two hours on the task. He frequently did not have an appetite, however, and went days without eating. He could manage household chores such as cleaning and laundry, as well as repairs such as painting and hanging blinds, but these tasks took a long time to complete because he was interrupted by headaches. He no longer did yard work because he could not maneuver a lawn mower. He was able to drive, and went shopping once a month. He managed financial accounts, counted change, and paid bills without difficulty. In response to a question about his interests and hobbies, plaintiff wrote "relaxing," which he was not able to do often, due to his conditions. When asked what places he went on a regular basis, plaintiff listed the gas station, barber shop, and stores. He was able to follow written and spoken instructions "thoroughly" and had no difficulty with authority figures so long as they did not "us[e] their position as power." He believed that he handled stress very well and he "embrace[d] change." Plaintiff had difficulty with lifting, seeing, completing tasks, concentrating, using his hands, and

remembering.  His medications caused blurred vision, dizziness, and drowsiness.  He could walk up to 2,000 steps before he needed to rest for the remainder of the day.

In 1999, while plaintiff was in the Air Force, he fell from a truck onto pavement.  He testified that he sustained a traumatic brain injury (TBI) and broke his right wrist.  He also developed PTSD as a result of the incident.[3]  According to his testimony, the brain injury caused him to be very sensitive to sound, smell, and light, which triggered his nerves and caused muscle spasms and severe headaches.  As a consequence of these sensitivities, he avoided leaving the house or interacting with others.  (Tr. 155-57).  He had daily headaches that lasted anywhere between 10 minutes and an entire day.  When he felt a headache starting, he would lay down in a quiet dark room for about 30 minutes.  (Tr. 158).  He estimated that he spent 20% to 30% of the day laying down.  (Tr. 188-89).  Since he had begun weekly acupuncture treatment, his most severe headaches lasted about 30 minutes.  (Tr. 157-58, 169).  The headaches also caused blurred vision and loss of appetite.  (Tr. 158).  He testified he had a doctor's approval to use marijuana and cannabidiol (CBD) to treat the headaches.  (Tr. 158-59).  He wore a TENS unit throughout the day for back spasms and used a massager about an hour a day for neck and back pain.  (Tr. 169).

Plaintiff testified that all the bones in his right wrist were broken in the fall from the truck.  He was unable to type or put pressure on the wrist and or lift anything as heavy as a gallon of milk.  (Tr. 156).  He had difficulty grasping large objects that required him to use his entire hand rather than just his fingers.  He also had nerve damage in the arm from his fingertips

_____

[3] The Department of Veterans Affairs found that plaintiff was unable to work due to his service-connected disabilities and granted him a 100% service-connected disability rating as of August 10, 2015.  (Tr. 22, 330-32, 323-29).  This opinion is not binding on the Social Security Administration.  20 C.F.R. 404.1504.

to his shoulder. As a consequence, he had difficulty with a number of tasks, including shaving, tooth brushing, writing, and tying shoes. He typically wore sweatshirts and sweat pants so that he did not have to manage buttons and zippers. In cold weather, he experienced numbness in the arm. (Tr. 156, 164-66).

Plaintiff described himself as short-tempered and quick to sever ties with others. He was ordered to take anger-management classes after he was charged with domestic peace disturbance for his actions in the midst of an anxiety attack. (Tr. 161). He testified that he did not feel safe in groups due to his PTSD. He had had two flashbacks or blackouts in the past five years. He also had panic attacks. (Tr. 162-63). He testified at the hearing that he slept for 12 to 18 hours every day; he did not clean his house and rarely cooked. (Tr. 167-68).

Vocational expert Delores Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to light work, who could frequently use his dominant (right) arm and hand to reach, handle, finger, and feel; who should never climb ladders, ropes, or scaffolds or work at unprotected heights; who was limited to no more than occasional exposure to temperature extremes, and who should not be exposed to more than moderate noise or bright, glaring lights. In addition, the individual should not be required to work in crowds. (Tr. 184). According to Ms. Gonzalez, such an individual would be able to perform plaintiff's past work as a dispatcher, assistant manager, and pawnbroker. In addition, the individual would be able to perform work as an order caller, mail clerk, and a router. The same work would be available if the individual were additionally limited to occasional interaction with the public. The individual would be unable to perform plaintiff's past relevant work if he were further limited to only occasional use

of the dominant arm and hand, but there would be other work available in the national economy, such as furniture rental consultant, usher, and bus monitor.  (Tr. 186).  All work would be precluded if the individual also required extra breaks or displayed verbal aggression or irritability toward others.  (Tr. 187).

**B.**    **Medical Evidence**

During the period under consideration, plaintiff received treatment for pain in his right wrist and arm, pain in his low back and neck, migraines, PTSD, and possible traumatic brain injury or post-concussion syndrome.  Most of his treatment was provided through Veterans Administration (VA) medical centers in Poplar Bluff and St. Louis, Missouri.

An MRI of plaintiff's right wrist completed on February 18, 2014, showed no fracture or bone marrow signal abnormality.  The joint spaces were normal without chondrosis, and the cartilage, ligaments, tendons, nerves, and carpal tunnel were all normal.  (Tr. 410-11).  An arthrogram of the right wrist showed no evidence of instability.  (Tr. 412-13).

Plaintiff saw nurse practitioner Loretta King, R.N., on November 25, 2014.  (Tr. 497-500).  Plaintiff reported that he was losing hair on his legs, which occasionally cramped.  He also complained of wrist pain and requested a referral to orthopedics.  Ms. King noted that plaintiff had full grip strength.  Plaintiff was prescribed medication to treat a vitamin D deficiency.  He had no other medications.  A PTSD screen administered that day was negative; records reflect that a PTSD screen administered in March 2015 was positive.  (Tr. 501, 443).

On December 24, 2014, orthopedist Gary Miller, M.D., noted that plaintiff continued to complain of pain in the right wrist.  (Tr. 448-49).  He had received some relief from an injection administered at an earlier visit but had now exhausted conservative treatment.  While x-rays

were normal, other imaging studies were consistent with arthritis. Dr. Miller opined that plaintiff's diagnosis "would appear to be scapholunate chondrosis,"[4] but that the proper course of treatment was unclear. A new MRI completed on February 9, 2015, was consistent with bone marrow edema.[5] (Tr. 418-19). In June 2015, the Pain Management Clinic evaluated plaintiff's right wrist pain, which plaintiff rated at level 10 on a 10-point scale. (Tr. 437-42). The pain radiated into his arm and fingers and was accompanied by numbness. It improved when he rested his hand and worsened when he wore splints. On examination, plaintiff exhibited intact sensation and grossly intact strength without focal weakness. Despite his reported level of pain, he shook hands without difficulty and did not appear to be in distress. Waddel's signs were negative.[6] A trial of gabapentin for treatment of the neuropathic component of plaintiff's pain was proposed. Plaintiff was directed to return to Orthopedics if he wanted a steroid injection.

On March 16, 2015, plaintiff told Ms. King that he wanted to be screened for PTSD. He stated that he could not sleep and that his girlfriend said he tried to choke her while she slept, although he was not positive this incident occurred. (Tr. 487-91). Ms. King's notes reflect that

---

[4] The scapholunate ligament complex joins two carpal bones. See https://radiopaedia.org/articles/scapholunate-ligament-complex?lang=us (last visited Mar. 14, 2019).

[5] Bone marrow edema, now known as bone marrow lesions, constitutes a central component of a wide variety of inflammatory and non-inflammatory rheumatologic conditions and is considered a significant source of pain and is linked to increased disease activity in many musculoskeletal conditions (for example, osteoarthritis, rheumatoid arthritis). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4662576/ (last visited Mar. 15, 2019).

[6] "Waddell's signs and symptoms have been described as patient presentations not within usual anatomic patterns of injury pathology. Waddell's signs were thought to indicate psychological distress and were termed 'non-organic findings'; similarly, Waddell's symptoms were described as inappropriate and attributable to psychological features. Endorsement of more than two of Waddell's symptoms is thought to be associated with psychological distress, disability, and poor treatment outcomes; however, this has not been empirically assessed." R.N. Carleton, et al., "Waddell's symptoms as indicators of psychological distress, perceived disability, and treatment outcome," J. Occup. Rehabil. Mar. 2009. http://www.ncbi.nlm.nih.gov/pubmed/19205852 (last visited on March 6, 2019).

plaintiff used marijuana on a daily basis since age 18; he ran or walked on a daily basis; and he ate one meal a day. Results on a screening test suggested moderate depression. Ms. King referred plaintiff to mental health services for further evaluation of PTSD, insomnia, and depression. (Tr. 443).

Rebecca A. Stout, Ph.D., completed an initial psychological evaluation on March 23, 2015. (Tr. 483-87). Plaintiff stated that he slept two to four hours at a time, and woke up drenched in sweat. He did not recall having nightmares or dreams. He stayed awake for two to three hours before falling back to sleep. He smoked marijuana to calm down and fall back to sleep. He struggled with irritability and felt that he had a short fuse. He felt detached from others, although he made an effort to stay engaged with his two children. He had hoped to make the military his career before being discharged due to injuries. He worked as a stand-up comic, which he stated provided an outlet for stress. He described his mother as emotionally abusive and had no recall of a five-year period of his childhood. Plaintiff reported that he was having difficulty with focus, concentration and memory. Nonetheless, Dr. Stout noted, he had no desire to quit using marijuana. Plaintiff's responses to a screening test did not endorse sufficient symptoms to support a finding of PTSD. Similarly, he did not identify a clear stressor, although Dr. Stout suspected he had experienced childhood trauma. Dr. Stout proposed that plaintiff participate in time-limited treatment using cognitive-behavioral therapy. Over the course of eight sessions, plaintiff reported improvement in his mood and sleep, and he travelled out of state to perform in comedy shows. (Tr. 481-82; 478-80; 476-78; 474-76; 463-65; 458-60; 450-51; 826-27). In June 2015, Ms. King started plaintiff on amitriptyline to address his insomnia (Tr. 465), and by September 2015, plaintiff's sleep, concentration, and appetite were all within

normal limits. (Tr. 827). Plaintiff's mood was "great" and stable and he had demonstrated efficacy in coping skills. Dr. Stout and plaintiff "mutually agreed on termination."

Three weeks after terminating with Dr. Stout, plaintiff told primary care physician Cheryll D. Rich, M.D., that he continued to have PTSD and TBI-related mental health symptoms, nightmares in particular. (Tr. 821-22). In addition, he complained of chronic wrist pain and night-time foot cramps.[7] He requested further mental health and pain management services. His reported pain level at that visit was 2 on a 10-point scale. (Tr. 823). He continued to take amitriptyline, vitamin D, and gabapentin. (Tr. 824).

In October 2015, plaintiff told pain specialist Dale Klein, M.D., that a non-VA doctor had recommend surgery for his wrist pain but plaintiff was uncertain whether surgery would help. (Tr. 582-85). He had obtained some relief from steroid injections in the past. On examination, plaintiff had slightly decreased range of motion of the wrist, mild tenderness to palpation, full strength, and no evidence of atrophy. Dr. Klein opined that plaintiff's symptoms were most consistent with scapholunate chondrosis but noted that it was not possible to exclude tendinitis. (Tr. 584-85). Treatment options included over-the-counter analgesics, unspecified compounded medications, occupational therapy, steroid injection, and surgery. Dr. Klein recommended treatment with compounded medications and occupational therapy. He also suggested that plaintiff be seen at the traumatic brain injury clinic. Plaintiff reported that he would discuss surgery with his attorney.

Amanda Wallace, Psy.D., assessed plaintiff's mental health needs on October 21, 2015. (Tr. 586-88). Plaintiff described feeling as though he was "in a life-or-death situation all the time," with anger that went "from 0-60 quickly," and feelings of suspicion. He awoke with night

---

[7] It was later determined that plaintiff had mild peripheral vascular disease in both legs. (Tr. 415).

sweats more than five times a week.  He was not taking his gabapentin and amitriptyline as prescribed because they made him too sleepy but continued to smoke "$10-$20 worth" of marijuana a day.  He was doing stand-up comedy.  Dr. Wallace diagnosed plaintiff with an unspecified anxiety disorder and "personal history of TBI" and referred him for counseling.

Plaintiff underwent a mental health evaluation in November 2015.  (Tr. 774-79; 772-74).  Plaintiff reported that, starting in 2002, he woke up in a sweat and slept only four hours a night.  He re-experienced the injury-causing accident and had angry feelings about having to leave the military.  He avoided crowded places and "unsecure" locations.  He lived alone and had "a few friends."  He reported that he had "no gray areas," said what he thought, and did not care about other people's feelings.  He was easily angered and was hypervigilant.  Other people described him as harsh.  He was outgoing when doing stand-up comedy and felt close to his fans, but otherwise described himself as a loner.  On mental status examination, plaintiff was alert and oriented, appropriate and cooperative, with a full range of affect.  His thinking was concrete and he had impaired insight, judgment, and memory.  He was diagnosed with PTSD and assessed a Global Assessment of Functioning (GAF) score of 80.

Between late November 2015 and late January 2016, plaintiff had four outpatient sessions with a readjustment counseling therapist.  (Tr. 768-70, 756-57, 752-55, 749-51).  He presented with a broad affect, and was responsive, articulate and oriented.  The therapist noted that plaintiff remained fairly rigid in his thinking and had declined to work on a TBI workbook he had been provided.  He did not keep an appointment scheduled for February 12, 2016, and had no further contact with the readjustment counseling therapist.  (Tr. 748).

On May 6, 2016, plaintiff saw Debi Schuhow, A.P.R.N., to discuss psychiatric medications. (Tr. 740-43). He stated that he did not take amitriptyline every night, even though it helped him sleep, because it made him groggy. He reported night sweats and occasional nightmares. He had decreased appetite with weight loss, moderate anhedonia, moderate to severe muscle tension, and hypervigilance without startle response. He engaged in some compulsive behaviors, including checking perimeters at night. He reported that he generally distrusted others and felt overwhelmed and emotionally detached. On mental status examination, he had very good grooming and personal hygiene. He sat with a guarded posture and his interpersonal behavior was guarded but cooperative, with mild psychomotor retardation and mildly avoidant eye contact. His mood was anxious, with mildly to moderately dysphoric affect. He was close to tears at one point. His insight and judgment were very good, his intelligence was above average, and his memory was grossly intact. Ms. Schuhow discontinued amitriptyline and started plaintiff on escitalopram oxalate[8] and prazosin to suppress nightmares. At follow up on May 27, 2016, plaintiff complained that the escitalopram caused stomach cramps, and Ms. Schuhow substituted the antidepressant bupropion. (Tr. 722-26). She diagnosed plaintiff with PTSD, a history of traumatic brain injury, insomnia due to his mental disorder, and cannabis use disorder. (Tr. 725). There is no evidence in the present record that plaintiff had further contact with Ms. Schuhow.

With the exception of an appointment for dental care, there is a gap in the treatment record until February 2017, when plaintiff sought treatment for worsening headache pain with dizziness, nausea, and occasional blurred vision. In visits to an urgent care clinic and with

---

[8] Escitalopram is a selective serotonin reuptake inhibitor used to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a603005.html (last visited March 6, 2019).

primary care providers, plaintiff rated the pain at 10 on a 10-point scale.  (Tr. 710-16; 703-05, 705-09).  He was treated with Toradol injections and given a prescription for fioricet. A CT scan of the head showed mild sinusitis.  (Tr. 513-14).  He was referred for consultations for sleep apnea, TBI, neurology, and acupuncture.  (Tr. 703-05).

Between March and September 2017, chiropractor Carl K. Winkle, D.C., administered 18 chiropractic and/or acupuncture treatments to plaintiff.  (Tr. 564-65; 690-91; 687-90; 681-83; 676-77; 661-63; 657; 653-55; 649-51; 640-42; 636-39; 632-35; 621-23; 616-18; 612-15; 608-11; 604-07; 589-91).  At the initial evaluation, Dr. Winkle noted that plaintiff did not appear to be in distress.  On examination, the Dix-Hallpike maneuver produced vertigo symptoms.[9]  The range of motion of plaintiff's cervical spine was mildly restricted and he had tightness and tenderness in the muscles of his neck and shoulders.  X-rays of the lumbosacral and cervical spine showed normal alignment with normal disc spaces, with very mild degenerative changes and questionable neural canal narrowing, although the appearance may have been secondary to positioning.  (Tr. 511-12).  Dr. Winkle assessed plaintiff with chronic headaches/cervicalgia, and biomechanical lesions of the cervical, thoracic, and lumbar spine.  The goals of treatment included reducing muscle hypertonicity, spasms, pain, and trigger points; facilitating inhibition of the sympathetic nervous system; and decreasing intersegmental joint dysfunction.  (Tr. 650). Over the course of treatment, Dr. Winkle noted that plaintiff had good short-term responses to treatments but no long-term benefit and his prognosis was guarded.

Plaintiff also participated in physical therapy for low back pain between March and May 2017.  (Tr. 539-40; 680-81; 679; 678; 660-61; 656; 652; 648).  In addition to sessions with the

---

[9] The Dix-Hallpike maneuver is used to identify benign positional paroxysmal vertigo (BPPV). https://www.ncbi.nlm.nih.gov/books/NBK459307/ (last visited on Mar. 15, 2019).

therapist, plaintiff was provided with a TENS unit and home exercise program. Plaintiff reported that the TENS unit provided temporary relief, but only when he was using it. After several sessions, the therapist opined that plaintiff's "stiff-backed walking style with significant hypomobility" when walking was the source of continued low back pain. (Tr. 652). At discharge, plaintiff reported that he was improved and that, although he still got muscle spasms, he was better equipped to deal with them. (Tr. 648).

Plaintiff had a polytrauma consultation on April 11, 2017. (Tr. 547-50; 673-75). Plaintiff told psychiatrist Asifa N. Sufi, M.D., that he had no recollection of his actions immediately after falling from the truck in 1999. In 2009, he started to experience numbness in his right hand and arm; in 2010, he began to have headaches; and in 2011, he developed memory problems. He slept only three or four hours a night. His symptoms had worsened over time and now his headaches rated between 7 and 10 on a 10-point scale. Plaintiff told Dr. Sufi that a CT scan of his head taken when he left the Air Force showed that he had sustained brain trauma. He experienced severe or very severe dizziness, loss of balance, light sensitivity, nausea, numbness, memory loss, fatigue, and depression, among other problems. He smoked marijuana three hours a day for pain control. On examination, Dr. Sufi noted that plaintiff had a normal gait and was able to stand on heels and toes, tandem walk, and rise from a partial squat. His cervical range of motion was within functional limits; he had symmetrical shoulder shrug; and was able to do rapidly alternating movements. Romberg and Spurling tests were negative, while Tinel test was positive at the right elbow. He had full motor strength and normal, symmetric reflexes. Plaintiff reported pain "in even the lightest touch on neck and back," and reported decreased feeling on first one side of his face and then the other. (Tr. 549). Dr. Sufi concluded that it was unlikely

that plaintiff's headaches, memory issues, and dizziness were due to his "mild TBI" in 1999. (Tr. 550). First, contrary to his representation, plaintiff's past CT scan of the head was normal; in addition, his responses to touch suggested symptom magnification; finally, it is unlikely for symptoms of TBI to appear 10 years after a mild injury. Dr. Sufi told plaintiff that marijuana use impairs cognition and memory and suggested that his primary care physician increase the dosage of his gabapentin to address the headaches and pain and tingling in the right arm. Polytrauma nurse Amy Alter, M.S.N., similarly told plaintiff that his memory, focus, and attention were likely to suffer so long as he continued to use marijuana. (Tr. 673-75). She encouraged him to get counseling for his anger and mental health concerns. Plaintiff was not scheduled for any further care with the polytrauma clinic.

At a primary care visit on June 13, 2017, plaintiff rated his headache pain at level 7 and he asked for a prescription for hydrocodone. (Tr. 630, 626). He was prescribed fioricet. The results of a screening test for depression were negative.

Plaintiff saw Sarkis M. Nazarian, M.D., a headache management specialist, on June 22, 2017. (Tr. 833-36). Plaintiff reported that he had severe headaches every day. He rated the headaches between levels 8 and 10 and described them as sharp, with squeezing and intense pressure. He had migraine features, including nausea, sensitivity to light and sound, blurred vision and vertigo. On examination, plaintiff had moderate to severe tenderness of the occipital and auriculotemporal nerves, but no trigger points in the neck, upper back, and shoulders. He had a slight limitation in the range of motion of his neck. Dr. Nazarian's diagnostic impression was migraine with aura, intractable, with status migrainosus; post-concussion syndrome; bilateral

occipital neuralgia; ulnar neuropathy at the elbows; and carpal tunnel syndrome of the right. Dr. Nazarian administered bilateral occipital nerve blocks.

A sleep study completed on April 21, 2017, disclosed a sleep efficiency of 65% with 19 spontaneous arousals per hour. (Tr. 837-38). Plaintiff was not diagnosed with sleep apnea.

Plaintiff returned to see Dr. Nazarian on September 15, 2017. (Tr. 829-32). He reported that the nerve blocks helped for about two weeks, after which the headaches returned full force. He had increased his gabapentin, which controlled his neuropathic pain in his arms. He got limited relief from Imitrex. Dr. Nazarian increased plaintiff's Nortriptyline and added Flexeril to his existing medications.

### C. Opinion Evidence

On October 26, 2015, State agency consultant Martin Isenberg, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 213-16, 221-24). Dr. Isenberg concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.06 (anxiety disorders).[10] Dr. Isenberg found that plaintiff had mild restrictions in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence and pace. He had no repeated episodes of decompensation of extended duration. Dr. Isenberg noted that plaintiff's mood was consistently stable and he was able to travel to pursue his standup comedy career. Dr. Isenberg did not complete a mental residual functioning capacity assessment. The ALJ assigned Dr. Isenberg's opinion little weight because evidence submitted at the hearing level demonstrated that plaintiff's PTSD and cannabis abuse disorder caused more than a minimal limitation of function. (Tr. 22).

---

[10] Dr. Isenberg also considered the listing for substance addiction disorders and noted that plaintiff claimed disability due to PTSD.

On November 9, 2015, nurse practitioner Cheryl C. Allen, M.S.N., F.N.P.-B.C. completed a compensation and pension examination, in which she addressed plaintiff's complaints of headaches, wrist pain, carpal tunnel syndrome, and TBI. (Tr. 784-808). Ms. Allen stated that it was not possible to determine the degree to which plaintiff's signs or symptoms were attributable solely to TBI rather than his chronic marijuana usage. (Tr. 808). Ms. Allen opined that plaintiff's headaches were likely to result in increased absenteeism (Tr. 787, 808) and that he had limited endurance and strength in his right wrist due to pain and numbness. (Tr. 798-800, 804). The ALJ gave little weight to Ms. Allen's opinion that plaintiff's headaches could reasonably cause increased absenteeism, stating that the opinion was "not bolstered by citations to the evidence, further narrative explanation, or objective findings." (Tr. 23). The ALJ granted some weight to Ms. Allen's assessment of plaintiff's right wrist pain. Id.

Psychologist David M. Van Pelt, Psy.D., completed a compensation and pension examination on December 3, 2015, in which he assessed plaintiff's complaints of TBI and PTSD. (Tr. 758-68). Dr. Van Pelt concluded that plaintiff had "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." (Tr. 759). Dr. Van Pelt also determined that plaintiff met the diagnostic criteria for PTSD, identifying plaintiff's accident and injuries as the precipitating stressor. (Tr. 765-67). The ALJ gave little weight to Dr. Van Pelt's assessment that plaintiff would have intermittent periods of being unable to work, finding that the assessment was not supported by the treatment records. (Tr. 23).

### III.  Standard of Review and Legal Framework

      To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.  See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

      The Social Security Administration has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether

claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v.

Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff met the insured status requirements through September 1, 2017, and had not engaged in substantial gainful activity since September 1, 2015, the amended onset date. (Tr. 13). At steps two and three, the ALJ found that plaintiff had severe impairments of migraines, chondrosis of the right wrist, right arm neuropathy, spinal osteoarthritis, PTSD, and cannabis use disorder.[11] Plaintiff's alleged asthma and anxiety were not severe. Plaintiff does not challenge the ALJ's findings regarding his severe impairments. The ALJ then determined that plaintiff did

---

[11] In 1996, Congress amended the Social Security Act to eliminate benefits for disabilities arising from addiction to alcohol or other drugs. Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). Because the ALJ determined that plaintiff was not disabled, it was not necessary to determine whether his cannabis use was a material factor contributing to any disability. See id. at 695 (setting out three-step process for determining whether substance use is material to disability).

not have an impairment or combination of impairments that met or medically equaled a listed impairment.[12] (Tr. 13-14).

The ALJ next determined that plaintiff had the RFC to perform light work, but was limited to no more than frequent use of his right arm and hand. He could never climb ladders, ropes or scaffolds, or work at unprotected heights or near moving mechanical parts. He could be exposed to moderate noise levels, but never to crowds or bright, glaring lights. Finally, he was limited to occasional interaction with the general public. (Tr. 16). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 18).

At step four, the ALJ concluded that plaintiff had no past relevant work. (Tr. 24). His age on the application date placed him in the "younger individual" category. He had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not material because plaintiff did not have past relevant work. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as an order caller, mail clerk, and a router. (Tr. 24-25). Thus, the ALJ found that plaintiff was not

---

[12] For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild limitation in his abilities to understand, remember and apply information, and in maintaining concentration, persistence, and pace. He had moderate limitation in interacting with others and no limitation in adapting or managing himself. (Tr. 15-16). He did not satisfy the paragraph C criteria.

disabled within the meaning of the Social Security Act from September 1, 2015, the alleged

onset date, through November 20, 2017, the date of the decision.  (Tr. 19).

## V.  Discussion

Plaintiff argues that the RFC assessed by the ALJ is not supported by "some" medical

evidence as required under the standards contained in Singh v. Apfel, 222 F.3d 448 (8th Cir.

2000) and Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  In particular, plaintiff argues that

the ALJ improperly assessed his subjective complaints, improperly assessed opinion evidence,

and failed to cite medical evidence to support the finding that he can sustain work activity

despite migraine headaches and impairments of the right arm and wrist.

### A.      Subjective Complaints of Pain

In evaluating a claimant's subjective complaints,[13] the ALJ must consider:  (1) the

claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating

and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any

functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical

evidence to support the claimant's complaints.  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir.

2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ must

acknowledge and consider the Polaski factors before discounting a claimant's subjective

complaints, the ALJ "need not explicitly discuss each Polaski factor."  Wildman v. Astrue, 596

F.3d 959, 968 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  An

---

[13] For decisions made on or after March 28, 2016, Social Security Ruling 16-3p eliminates the term
"credibility" from the analysis of subjective complaints, clarifying that "subjective symptom evaluation is
not an examination of an individual's character."  SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin.
Oct. 25, 2017 (republished)).  The factors to be considered in evaluating a claimant's statements,
however, remain the same.  See id. at *13 ("Our regulations on evaluating symptoms are unchanged.");
see also 20 C.F.R. §§ 404.1529, 416.929.

ALJ may discount a claimant's complaints if there are inconsistencies in the record as a whole, and the courts "will defer to an ALJ's finding [regarding subjective complaints] as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Wildman, 596 F.3d at 968 (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)). "The ALJ is in a better position to evaluate [subjective complaints], and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015).

The ALJ here found that the evidence did not support plaintiff's allegations of severe and extensive nerve damage in his right wrist and arm. (Tr. 18). Plaintiff testified that he broke all the bones in his wrist in 1999, making it hard for him to write and type. (Tr. 156). Imaging studies of plaintiff's right wrist were not consistent with the degree of injury plaintiff described. In December 2014, x-rays revealed no evidence of arthritic changes, while subsequent evaluations indicated scapholunate chondrosis and marrow edema. (Tr. 18, 419-20, 448-49, 418). The results of physical examinations also were not consistent with the degree of pain and injury plaintiff claimed. At an evaluation for right wrist pain in June 2015, plaintiff was not in apparent distress and shook hands without difficulty, despite having rated his pain at level 10. (Tr. 438-39). A physical examination of his wrist in October 2015 revealed a slight decrease in the range of motion with mild tenderness to palpation of his scapholunate ligament. He had normal pulses, motor function, muscle strength, sensation, and reflexes. An examination in November 2015 showed mildly diminished flexion and extension strength, without any atrophy or evidence of degenerative or traumatic arthritis. (Tr. 794-95). At a primary care visit in May 2016, plaintiff reported that he felt good and denied any acute symptoms. (Tr. 730). In March

2017, plaintiff reported no musculoskeletal complaints. (Tr. 703-04). An ALJ may properly discount a claimant's subjective exaggerated or overstated complaints. Kamann v. Colvin, 721 F.3d 945, 951 (8th Cir. 2013).

With respect to plaintiff's complaints of daily disabling headaches,[14] in May 2016, plaintiff reported that he had headaches "periodically." (Tr. 730). On February 24, 2017, plaintiff sought treatment at the VA urgent care center for worsening headache and dizziness. (Tr. 711). On examination, he was speaking in full sentences with clear speech, his breathing was non-labored, and his gait was steady. An MRI completed on March 6, 2017, showed mild sinusitis. (Tr. 513). At his initial chiropractic assessment two days later, plaintiff rated his headache pain at level 10. Nonetheless, he was in no apparent distress, despite an examination that included palpation of his head and neck and testing of his cervical range of motion. (Tr. 564). In April 2017, Dr. Sufi opined that plaintiff's complaints of pain on examination were the result of symptom magnification, and polytrauma nurse Amy Alter noted that plaintiff felt he received inadequate care following his 1999 injury and urged him to seek counseling to address his anger. (Tr. 550, 675). At a primary care visit in September 2017, plaintiff appeared to be "in minimal distress." (Tr. 599).

Plaintiff argues that the ALJ failed to adequately address his difficulties with maintaining focus and staying on task. [Doc. # 20 at 13]. In his Function Report, plaintiff stated that he did not finish what he started. He also stated, however, that he was able to follow instructions "thoroughly." (Tr. 373). And, although he complained of "mild memory loss," (Tr. 805), there

---

[14] The ALJ found that plaintiff's severe impairments included migraines. (Tr. 13). Although plaintiff believed the migraines were attributable to his 1999 accident, the medical evidence is equivocal on this point. Clearly, the cause of plaintiff's headaches has implications for the appropriate treatment, but the Court does not believe that any disagreement regarding the cause is relevant to the analysis of his subjective complaints.

is no evidence in the record that any treatment provider noted a concern about plaintiff's memory or ability to focus or concentrate. Indeed, in May 2016, psychiatric nurse Debi Schohow stated that plaintiff's memory was "grossly intact," and his thought processes were goal-directed and coherent. (Tr. 725). To the extent that plaintiff subjectively believes that his memory, focus and attention are impaired, he was informed that his daily marijuana use was a contributing factor, and he was advised to quit as early as March 2014. (Tr. 550, 673, 105). A year later, he still saw no negative consequences from his marijuana use. (Tr. 486). In assessing plaintiff's subjective complaints of diminished memory and focus, the ALJ was entitled to consider plaintiff's unwillingness to quit smoking marijuana despite medical advice that he do so. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow treatment recommendations weighs against credibility); King v. Berryhill, No. 4:17-CV-2512-ERW, 2019 WL 1129971, at *7 (E.D. Mo. Mar. 12, 2019) (same).

Plaintiff's activities are also inconsistent with his allegations of disabling pain and impaired concentration, memory, and focus. In his September 2015 Function Report, plaintiff reported that he cooked, handled household chores, managed his own finances, did his own shopping and cooking, and drove.[15] In 2015, he travelled out of state to perform as a stand-up comedian. See Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014) (assertion of total disability undermined where claimant "performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family.").

---

[15] During the time under review, plaintiff received care in Poplar Bluff and St. Louis, roughly 30 miles and 180 miles, respectively, from his home in Malden, Missouri. (Tr. 506-10).

In formulating the RFC, the ALJ accounted for plaintiff's severe impairment of the right arm and wrist by limiting him to no more than frequent use of the right arm and for his headaches by restricting his exposure to bright glaring lights and noise. The ALJ's conclusion that plaintiff's allegations of further limitations are not credible is supported by sufficient reasons and substantial evidence in the record as a whole.

### B.   Opinion Evidence

Plaintiff suggests that the ALJ improperly discounted the opinion of nurse Cheryl Allen that plaintiff's headaches would cause increased absenteeism. [Doc. # 20 at 8]. The ALJ found that this opinion, which was not supported by citations to medical evidence, narrative explanation, or objective findings, relied on plaintiff's self-reports. (Tr. 21, 23). An ALJ may discount a medical opinion that appears to be based solely on the claimant's subjective complaints, particularly where, as here, the ALJ has discounted those subjective complaints after a proper analysis. Gonzales v. Barnhart, 465 F.3d 890, 896 (8th Cir. 2006). The ALJ also gave little weight to Dr. Van Pelt's assessment that plaintiff had "intermittent periods of inability to perform occupational tasks," noting that they were inconsistent with plaintiff's mental health treatment records, which generally reflected intact functioning. (Tr. 23). If a medical opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (citation omitted).

### C.   Medical Evidence to Support RFC

"[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation

omitted).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).  Nevertheless, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Id.; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  When evaluating the RFC, an ALJ "is not limited to considering medical evidence exclusively," but may also consider a claimant's daily activities, subjective allegations, and any other evidence of record.  Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495 F.3d at 619-20).  Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006).  Where an ALJ fails to properly support the RFC with medical evidence, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole.  Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001).

As discussed above, the ALJ found that plaintiff had the RFC to perform light work, but was limited to no more than frequent use of his right arm and hand.  He could never climb ladders, ropes or scaffolds, or work at unprotected heights or near moving mechanical parts.  He could be exposed to moderate noise levels, but never to crowds or bright, glaring lights, and was limited to occasional interaction with the general public.  (Tr. 16).

Plaintiff asserts that the ALJ failed to support this RFC determination with "some" medical evidence as required under the standards in Singh, 222 F.3d 448, and Lauer, 245 F.3d

700.  As addressed above, the ALJ properly addressed plaintiff's credibility and in doing so, conducted a complete and detailed analysis of plaintiff's medical record.  The Court finds that the ALJ's RFC determination is consistent with the relevant evidence of record including the objective medical evidence, the observations of medical providers, and diagnostic test results, as well as plaintiff's credible limitations; that the ALJ's RFC determination is based on substantial evidence; and that plaintiff's arguments to the contrary are without merit.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of April, 2019.